[No. D019663. Fourth Dist., Div. One. Sept. 19, 1994.]

FRIENDS OF CUYAMACA VALLEY, Plaintiff and Appellant, v.
LAKE CUYAMACA RECREATION AND PARK DISTRICT, Defendant
and Respondent;
STATE OF CALIFORNIA ex rel. DEPARTMENT OF FISH AND
GAME, Intervener and Respondent.

**COUNSEL**

Richard J. Wharton for Plaintiff and Appellant.

Lloyd M. Harmon, Jr., County Counsel, Diane Bardsley, Chief Deputy County Counsel, and Theresa Osterman Stevenson, Deputy County Counsel, for Defendant and Respondent.

Rutan & Tucker and Hans Van Ligten for Intervener and Respondent.

## OPINION

**TODD, Acting P. J.**—The Friends of Cuyamaca Valley (Friends), a citizens group, appeals from a judgment denying its petition for a writ of mandate to compel the Lake Cuyamaca Recreation and Park District (District)[1] to make an environmental assessment under the California Environmental Quality Act (CEQA) (Pub. Resources Code,[2] § 21000 et seq.) with respect to the 1992-1993 duck hunting season. We reject arguments by the District and the State of California, by and through the California Department of Fish and Game (Department), that the appeal should be dismissed as moot. We further conclude that the Department is the lead agency under the CEQA and as such has the responsibility for making required environmental assessments. Accordingly, we affirm the judgment.

### FACTS

The District was established by the State of California in 1961. (Stats. 1961, ch. 1654, § 1, p. 3609.) It was empowered to:

"(a) Organize, promote, conduct, and advertise programs of community recreation;

"(b) Establish systems of recreation and recreation centers, including parks and parkways; and

"(c) Acquire, construct, improve, maintain and operate recreation centers within or without the territorial limits of the district." (Stats. 1961, ch. 1654, § 32, p. 3612.)

---

[1]The District's correct name is Lake Cuyamaca Recreation and Park District (Stats. 1961, ch. 1654, § 1, p. 3609); the Friends' petition erroneously names it Lake Cuyamaca Park and Recreation District.

[2]All statutory references are to the Public Resources Code unless otherwise specified.

In December 1966, the District entered into a cooperative agreement with the Department, in which the Department, at its sole expense, agreed to develop the Lake Cuyamaca Public Fishing Area and the District agreed to operate and manage the state-leased land and facilities as "a public fishing and waterfowl hunting area subject to the terms and conditions of this agreement." The 1966 agreement further states: "State laws and regulations relating to public . . . hunting . . . are applicable to all activities and operations of District and its concessionaires." The agreement was amended four times: in 1968; in 1971; in 1977; and in 1991. The 1977 amendment approved the development of additional facilities by the Department and changed the ending date of the agreement from December 31, 1986, to March 24, 2002.

Waterfowl hunting at Lake Cuyamaca began annually in 1968. Since the decision in *Wildlife Alive* v. *Chickering* (1976) 18 Cal.3d 190 [132 Cal.Rptr. 377, 553 P.2d 537], the Department and the State Fish and Game Commission have been preparing annual statewide environmental assessments under CEQA for the state's migratory game bird hunting programs.

In 1990 and 1991, the District formed a Waterfowl Hunting Committee to ensure the district complied with state regulations and its agreement with the Department to hold waterfowl hunting; these were tasks previously performed by the District's manager. Prior to the District's June 16, 1992, meeting, the Waterfowl Hunting Committee prepared a "SUGGEST WATERFOWL HUNTING PLAN FOR CUYAMACA LAKE - 1992," which, among other things, discussed the anticipated dates the state would set for the duck hunting season as well as operational concerns, such as closing the lake to fishing and boating during the month of December and the number and location of blinds along the lake. The proposed plan was approved by the District's board of directors at the June 16, 1992, hearing. A motion was made at the District's July 21, 1992, meeting to reconsider closing the lake during December; the motion failed. The District issued a press release, dated July 24, 1992, announcing the duck hunting season would start on December 2, 1992.

On August 28, 1992, the Department issued its annual statewide environmental assessment for migratory game bird hunting. On September 15, 1992, the Department issued the dates for the 1992-1993 Waterfowl Hunting Seasons, which included in pertinent part: December 5, 1992, to January 10, 1993.

Friends is a nonprofit unincorporated association consisting of residents of the town of Julian who live within 1,000 yards of Lake Cuyamaca. On

November 25, 1992, Friends filed a petition for writ of mandate, injunctive relief and application of stay, seeking to stay the winter 1992-1993 duck hunting season at Lake Cuyamaca on the ground that the District approved the season without environmental assessments as required by CEQA.

On November 30, 1992, the superior court declined to issue a stay, but ruled the petition should be heard on its merits. On May 13, 1993, the Department was given permission to intervene. During a hearing on May 21, 1993, the trial court commented:

"It seems to me that the duck season up at Lake Cuyamaca was declared when the State EID [Environmental Impact Document] had not been issued. It had not been issued until two months after the duck season was declared. So the powers that be up at Lake Cuyamaca saying that they relied on the State EID and therefore complied with CEQA doesn't track. They couldn't have relied on it, because it didn't exist.

"Now, the next problem is that the last duck season is over, so any rulings that I make with regards to that duck season are moot. As far as I can tell, in June and August of this year, the State plans to hold hearings on the EID, and public comment can be addressed by people up at Lake Cuyamaca whether this duck season is appropriate or not. It seems to me that if the powers-that-be up there at Lake Cuyamaca relied on the state EID they complied with CEQA, and it was done illegally last year, but it looks like it's going to be done in an appropriate fashion this year. And I don't know what order I can issue." The trial court, however, did not rule on the petition on May 21, 1993, but rather took the matter under submission. On June 11, 1993, the trial court filed a written order denying the petition for writ of mandate; the order did not specify any reasons. Judgment was entered in favor of the District on June 25, 1993.

DISCUSSION

I

The District and the Department urge us to dismiss this appeal as moot. We decline to do so.

The District and the Department correctly note that the case is moot in that ,the 1992-1993 duck hunting season, which the petition challenged, has long since passed. " '[W]hen, pending an appeal from the judgment of a lower court . . . an event occurs which renders it impossible for this court,

if it should decide the case in favor of plaintiff, to grant him any effectual relief whatever the court will not proceed to a formal judgment, but will dismiss the appeal.' " (*Consol. etc. Corp.* v. *United A. etc. Workers* (1946) 27 Cal.2d 859, 863 [167 P.2d 725].)

However, there is a recognized exception to the rule of automatic dismissal in moot cases that affect "the general public interest and the future rights of the parties, and there is reasonable probability that the same questions will again be litigated and appealed . . . ." (*People* v. *West Coast Shows* (1970) 10 Cal.App.3d 462, 468 [89 Cal.Rptr. 290].) "Application of the public-interest/likelihood-of-repetition exception to the mootness doctrine is discretionary." (*Save Stanislaus Area Farm Economy* v. *Board of Supervisors* (1993) 13 Cal.App.4th 141, 147 [16 Cal.Rptr.2d 408].) Here, the primary issue is whether the District is required under CEQA to undertake annual environmental assessments for duck hunting seasons or whether that function properly rests with the Department. Since this issue and the principles involved in interpretation of CEQA are of public importance and are likely to arise in the future, we deem it appropriate to discuss the questions involved, even though so far as the issuance of a writ of mandate to affect the 1992-1993 duck season is concerned, the matter has become moot. (See *Kirstowsky* v. *Superior Court* (1956) 143 Cal.App.2d 745, 749 [300 P.2d 163].)

The District's argument that Friends failed to seek declaratory relief and did not amend its petition to seek compliance with CEQA in future years is unpersuasive. "[Respondent's] suggestion that the issue could be determined in a declaratory relief action demonstrates that there is a continuing controversy ripe for decision." (*DiGiorgio Fruit Corp.* v. *Dept. of Employment* (1961) 56 Cal.2d 54, 58 [13 Cal.Rptr. 663, 362 P.2d 487].)

II

Under CEQA, the standard of appellate review is governed by sections 21168 and 21168.5, which divide CEQA actions into two categories: the former statute applies to proceedings in which a hearing is required, evidence is taken and the agency acts as a fact finder; the latter statute applies to all other actions taken pursuant to CEQA. Here, section 21168.5 is controlling.

Section 21168.5 provides our inquiry may extend only to whether there was a prejudicial abuse of discretion, which is established if (1) the agency has not proceeded in the manner required by law, or (2) the agency decision is not supported by substantial evidence.

## III

The main thrust of Friends' petition is that the District violated CEQA by approving the 1992-1993 duck hunting season without an environmental assessment as required by CEQA. We disagree. We find the record does not support a violation of CEQA because (1) responsibility for the required environmental assessments rested with the Department, not the District, and (2) the District's action in the summer of 1992 did not constitute approval of the duck hunting season.

### A.

The Legislature enacted CEQA in 1970 as a means to force public agency decisionmakers to document and consider the environmental implications of their actions. (§§ 21000, 21001; *Friends of Mammoth* v. *Board of Supervisors* (1972) 8 Cal.3d 247, 254-256 [104 Cal.Rptr. 761, 502 P.2d 1049], criticized on another ground in *Kowis* v. *Howard* (1992) 3 Cal.4th 888, 896 [12 Cal.Rptr.2d 728, 838 P.2d 250].) CEQA and its Guidelines (Cal. Code Regs., tit. 14, § 15000 et seq.) constitute a comprehensive scheme to evaluate potential adverse environmental effects of discretionary projects proposed to be carried out or approved by public agencies. (§ 21080, subd. (a); *Citizens for Quality Growth* v. *City of Mt. Shasta* (1988) 198 Cal.App.3d 433, 437 [243 Cal.Rptr. 727].) "The foremost principle under CEQA is that the Legislature intended the act 'to be interpreted in such manner as to afford the fullest possible protection to the environment within the reasonable scope of the statutory language.' " (*Laurel Heights Improvement Assn.* v. *Regents of University of California* (1988) 47 Cal.3d 376, 390 [253 Cal.Rptr. 426, 764 P.2d 278], quoting *Friends of Mammoth* v. *Board of Supervisors, supra,* 8 Cal.3d at p. 259.)

The issue here is not whether CEQA applies to duck hunting at Lake Cuyamaca, but rather whether the District was the public agency required under the act to evaluate potential adverse environmental effects of this activity. Or, using the applicable terms of art under CEQA, the issue is whether the District was the "lead agency."

Under CEQA, a "lead agency" is responsible for determining whether an environmental impact report (EIR) will be required for a given project. (§ 21080.1.) If an EIR is required, the lead agency must then prepare it and include it in any report on the project. (§§ 21105, 21165.) If the lead agency determines an EIR is not necessary because the proposed project will not

have a significant effect on the environment, the lead agency must prepare a "negative declaration" to that effect. (§ 21080, subd. (c).)

" 'Lead agency' means the public agency which has the principal responsibility for carrying out or approving a project which may have a significant effect upon the environment." (§ 21067.) Lead agency is to be distinguished from "responsible agency," which "means a public agency, other than the lead agency, which has responsibility for carrying out or approving a project." (§ 21069.) The CEQA Guidelines provide: "Where a project is to be carried out or approved by more than one public agency, one public agency shall be responsible for preparing an EIR or negative declaration for the project. This agency shall be called the lead agency." (Cal. Code Regs., tit. 14, § 15050, subd. (a).)

Our threshold question here is which agency is the lead agency for the annual duck hunting season, that is, which agency has the principal responsibility for the activity.

Duck hunting is primarily regulated by the federal government pursuant to the Migratory Bird Treaty Act (16 U.S.C. § 703 et seq.), which provides that states also may regulate the hunting of migratory birds so long as the state regulations fall within or are more protective than the federal regulatory scheme (16 U.S.C. § 708). Sections 355 and 356 of the California Fish and Game Code provide the State Fish and Game Commission may promulgate hunting regulations for migratory birds consistent with the federal regulatory scheme. The Fish and Game Commission, acting through the Department, sets the schedule for the waterfowl hunting season, adopts regulations governing the season (see Cal. Code Regs., tit. 14, § 500 et seq.) and issues hunting licenses. Under the 1966 agreement, the State of California, through the Department, acquired the right to establish waterfowl hunting at Lake Cuyamaca, and the District is obligated to operate and manage the hunting season on the lake, following all state laws and regulations. It follows that it is the Department, not the District, that is the agency that decides whether there will be a duck hunting season on Lake Cuyamaca in any given year and is therefore the "lead agency" as defined in section 21067 because it has the "principal responsibility for . . . approving a project which may have a significant effect upon the environment." The District is the "responsible agency" as defined in section 21069.

Moreover, it is instructive for historical purposes to review *Wildlife Alive* v. *Chickering, supra*, 18 Cal.3d 190, in which environmental groups sought

a writ of mandate requiring the Fish and Game Commission to suspend hunting for black bears and to revoke existing permits for hunting the bears. The superior court denied relief, but the Supreme Court reversed, holding that the Fish and Game Commission was subject to CEQA and must abide by its procedures. (*Id.* at p. 195.) It is undisputed in this record that since *Wildlife Alive*, the Department and the Fish and Game Commission annually have been preparing the functional equivalent of an EIR for migratory game bird hunting statewide, including duck hunting on Lake Cuyamaca. Although where more than one agency meets the lead agency criteria, the agency which acted first on the project in question is considered the lead agency (*Citizens Task Force on Sohio* v. *Board of Harbor Comrs.* (1979) 23 Cal.3d 812, 814 [153 Cal.Rptr. 584, 591 P.2d 1236]; *City of Sacramento* v. *State Water Resources Control Bd.* (1992) 2 Cal.App.4th 960, 970-973 [3 Cal.Rptr.2d 643]; Cal. Code Regs., tit. 14, § 15051, subd. (c)), this doctrine has no application here. In this case, the state's ownership interest in Lake Cuyamaca mandates its status as lead agency. The contractual delegation of administrative oversight in no way derogated the state's ownership status.

## B.

The core of Friends' petition is that the District violated CEQA by approving the 1992-1993 duck hunting season without a prior environmental assessment. We reject this argument because it is based on a faulty factual premise, namely that the District board's actions in June and July 1992 constituted approval of the 1992-1993 season. In fact, what the District did was adopt an implementation plan for the upcoming duck hunting season pending approval of the season by the Department. It is uncontroverted in this record that the waterfowl hunting plan adopted by the District board in June and July 1992 merely (1) set forth the anticipated state-set hunting season and operational issues such as the location and sale of duck blinds, and (2) presented the issue of whether to close the lake to fishing and boating during December, an economic and personnel matter for the District to consider. Notwithstanding the District board's adoption of the plan, whether and when the 1992-1993 duck hunting season was to take place was conditional upon the Department's action. Indeed, under the implementation plan adopted by the District board, duck hunting would begin on December 2; however, the season began on December 5 because the Department determined that would be the opening day of the pertinent season. Had the Department determined to cancel the duck hunting season, there would not have been a duck hunting season. In short, the District had contracted with the Department to operate and manage the duck hunting area subject to state laws and regulations, and the District board's actions in June and July 1992

merely constituted an implementation plan by the District to fulfill its contractual obligations for the anticipated season. Friends' characterization of the June and July 1992 board actions as approval of the duck hunting season without adequate environmental assessment simply is not apt.

## C.

The petition was properly denied because responsibility for required environmental assessments under CEQA lies with the Department, which is the lead agency, not the District.[3] According to the record before us, the Department addresses local environmental concerns such as those raised by Friends when it considers waterfowl hunting regulations and the certification of the annual environmental impact document during public meetings in the summer of each year. In appropriate cases, the Department has restricted duck hunting in specified areas in response to concerns aired by local citizens. (See, e.g., Cal. Code Regs., tit. 14, § 502, subd. (c)(2)(A) [closing part of Morro Bay to waterfowl hunting].) We conclude, for purposes of CEQA, Friends should address its environmental concerns to the Department, not the District.[4]

---

[3]In light of this conclusion, it is unnecessary for us to address the other contentions raised by the parties.

[4]In the Department's Final Environmental Document on Migratory Game Bird Hunting issued August 28, 1992, the Department discussed public input as follows:

"CEQA encourages public input. One of the primary purposes of the environmental document review process is to obtain public comment, as well as to inform the public and decision makers. It is the intent of the Department to encourage public participation in this environmental review process.

"Prior to preparing this FED, the Department developed a Notice of Preparation (NOP). The NOP was submitted to the State Clearinghouse on May 26, 1992 for distribution, as well as to land management agencies that have an interest, or play a key role in, migratory game bird management.

"The Department prepared a DED [Draft Environmental Document] regarding Section 502, Title 14, California Code of Regulations. The DED was made available for public review on June 29, 1992. It was mailed to five individuals and organizations who expressed interest in this issue. The individuals and organizations which reviewed the DED are listed in Appendix #19. Additionally, notice of the availability of the DED for public review was provided to the State Clearinghouse, which provided notice of availability to over 880 organizations, including all county governments in California. Notice of availability was also published in 24 major California newspapers. Each of the 24 newspapers has a daily circulation exceeding 50,000. The DED was also made available in the Department's five regional offices and in the Department's Bishop, Eureka, Menlo Park, Monterey and San Diego satellite offices."

At oral argument, the court augmented the record on appeal to include the completed Final Environmental Document.

## DISPOSITION

Affirmed.

Benke, J., and Froehlich, J., concurred.

Appellant's petition for review by the Supreme court was denied December 15, 1994. Mosk, J., was of the opinion that the petition should be granted.